FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2010 FEB -2 PM 2: 12

CLERK
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.

MICHAEL JOSEPH DIMARE

Case No. 3:10-cr-33-J-32TEM
Ct. 1: 18 U.S.C. § 1341
Forfeiture: 18 U.S.C. § 981(a)(1)(C) &
28 U.S.C. § 2461(c)

## INFORMATION

The United States Attorney charges:

### A. INTRODUCTION

At all times material herein, unless otherwise specified:

### THE DEFENDANT

1. At various times from at least 2001 through in or about May 2008, MICHAEL JOSEPH DIMARE ("DIMARE") was a resident of Ponte Vedra Beach, Florida, Jacksonville Beach, Florida, and at various times was employed by and/or represented John Hancock Financial Services ("John Hancock"), the Della Porta Agency ("Della Porta") and ING Financial Partners ("ING").

### B. BACKGROUND

2. DIMARE was employed by John Hancock Financial Services and later Della Porta from 1990 to June 2006. Della Porta was part of the John Hancock Financial Network, which provided investment and life insurance products under the affiliate Signator Investors, Inc.

3.  After DIMARE left Della Porta in or about June 2006, DIMARE remained affiliated with John Hancock inasmuch as DIMARE continued to operate within the John Hancock network as a licensed representative, which allowed DIMARE to continue to offer and sell investment and life insurance products to approximately three hundred and fifty known John Hancock clients until DIMARE was terminated by John Hancock in May 2008.

4.  In or about October 2006, DIMARE also became a licensed representative of ING Financial Services, Inc. ("ING"), which entitled DIMARE to sell ING investment and insurance products. DIMARE remained a licensed representative of ING until ING terminated DIMARE in May 2008.

5.  DIMARE held a State of Florida license number as a financial broker and registered representative. In 1993, DIMARE passed the Financial Industry Regulatory Authority ("FINRA") exam, Series 6, which allowed him to sell mutual funds, variable and fixed annuity products and whole life insurance products. DIMARE never passed the FINRA, Series 7, which would have allowed DIMARE to legally sell individual stocks and bonds.

6.  FINRA is a regulatory agency that oversees the financial industry.

### C. SCHEME AND ARTIFICE

Between in or about at least 2001 and in or about May 2008, at Ponte Vedra Beach, Jacksonville, in the Middle District of Florida, Boston, Massachusetts and elsewhere,

## MICHAEL JOSEPH DIMARE

the defendant herein, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, specifically offering known John Hancock and ING investors a fraudulent investment opportunity that DIMARE marketed as a "tax free corporate bond," as well as other permutations of that same investment.

### D. **MANNER AND MEANS**

1. It was part of the scheme and artifice to defraud that DIMARE, using his employment with John Hancock, the Della Porta Agency and ING, contacted investors, whom DIMARE had previous and ongoing legitimate investment relationships with via his John Hancock network affiliations, and fraudulently marketed an investment opportunity of a "tax free corporate bond."

2. There is no legitimate investment security known as a "tax free corporate bond."

3. It was part of the scheme and artifice that DIMARE told most of the investors that this particular investment, that is the "tax free corporate bond," would render a quarterly return on investment of approximately eight percent.

4. It was part of the scheme and artifice that DIMARE told some investors, many of whom are elderly, that the "tax free corporate bond" was offered for a limited time to Florida residents because of the hurricanes that hit the state of Florida in 2004. DIMARE told some investors that the program would take effect in January 2005 and would initially last only three months. DIMARE also told investors that any money

invested in this "tax free corporate bond" would have to be "new money," not funds transferred from an existing John Hancock or ING investment.

5.     It was part of the scheme and artifice that prior to 2004, DIMARE offered similar types of fraudulent investments to existing John Hancock and Della Porta clients, which, in many instances, mirrored the "tax free corporate bond" opportunity.

6.     It was part of the scheme and artifice that after the initial three month period of the "tax free corporate bond" (which purportedly began in 2004), DIMARE, about every six months, told investors that the bond program would continue for periods of six additional months. Further, DIMARE told investors in late 2007 that the bond program would likely extend through calendar year 2008.

7.     It was part of the scheme and artifice that on or about December 17, 2007, DIMARE drafted a letter on John Hancock letterhead (bearing the insignia and trademark of John Hancock) purportedly from "Donna Dow - Client Relationship Manager" to "Michael J. DiMare" advising, in substance, that the Corporate Bond series would extend through calendar year 2008, but no longer, based on the anticipation that the sustained high yield growth would not last beyond 2008.

8.     At the time the letter was issued, an individual named "Donna Dow" served as the John Hancock Manager of the Long Term Care New Business unit in Boston, Massachusetts, not as a "Client Relationship Manager" having any involvement with the purported "tax free corporate bond" investment. The December 17, 2007 letter was not authored or sent by Dow, but instead was created by DIMARE, who fraudulently attached Dow's name to the letter. There was no signature from "Donna Dow" on the letter.

9. It was part of the scheme and artifice that DIMARE then forwarded a copy of that letter to at least two investors, R.M. and S.M. (a married couple), sixty-seven and sixty eight years old respectively, and wrote a handwritten note on the face of letter stating, "[R and S] - Hopefully this fits into your plans and is a nice xmas present. Talk to you soon...Happy New Year!  Michael."

10. On or about January 7, 2008, after receiving this fraudulent letter with DIMARE's handwritten note on the face of the letter, R.M. and S.M. provided DIMARE an additional amount of $150,000 via check for DIMARE to invest in the "tax free corporate bond."

11. It was further part of the scheme and artifice that during the execution of the fraudulent scheme, DIMARE obtained funds from the investors via personal meetings.

12. It was part of the scheme and artifice that DIMARE took the monies received and deposited them into a bank account that DIMARE had opened in 2001 with First Union Bank (which later became Wachovia Bank) under the name "Michael J. Dimare dba John Hancock Financial Services."

13. DIMARE did not have authorization from John Hancock to open this account. At no time was this account an authorized John Hancock account for receipt of John Hancock investor funds.

14. Once DIMARE deposited these funds into the Wachovia Bank account, DIMARE utilized them for living expenses, car payments, rent payments for his apartment and office spaces, credit card payments, to pay certain customers their

"interest earned" on the "tax free corporate bond" investment or to provide a few customer requested withdrawals.

15.    It was part of the scheme and artifice that DIMARE also prepared "Consolidated Summary Statements" concerning the purported success of the fraudulent "tax free corporate bond" investment and mailed via the United States Mail and hand delivered those statements to the various investors setting forth the "accrued interest" on the "tax free corporate bond." These "Consolidated Summary Statements" were sent to the investors separate from the investors' statements concerning the legitimate investments they held with John Hancock. The "Consolidated Summary Statements" hand delivered and mailed to investors bore the insignia and trademark of John Hancock, listed the product as "corporate bond" and itemized dates and amounts of each deposit, which, for some investors, was as much as of $100,000 or $150,000 per deposit.

16.    It was further part of the scheme and artifice that, on or about April 15, 2008, DIMARE sent a "Consolidated Summary Statement" to R.M. and S.M. via the United State Mail.

17.    It was part of the scheme and artifice that in or about April 2008, when R.M. and S.M. asked DIMARE about obtaining internet access to their John Hancock account, DIMARE created a series of e-mail accounts and forwarded fabricated e-mails to R.M. and S.M. purportedly between DIMARE and a "Jim Cowlishaw," who DIMARE represented as the "Vice President for Corporate Information Technology Support" for John Hancock, concerning whether the "tax free corporate bond" clients would be afforded internet access to view the progress of their account.

18. "Jim Cowlishaw" was purportedly working on internet access capability for the tax free corporate bond clients. The fabricated e-mail address that DIMARE created was jcowlishaw@jhnetwork.com.

19. On or about April 23 and 24, 2008, DIMARE forwarded a series of e-mails to R.M. and S.M. that DIMARE had purportedly sent to "Jim Cowlishaw" concerning DIMARE's request to expedite web access for these particular tax free corporate bond clients. In the e-mail from DIMARE to "Jim Cowlishaw," DIMARE states, in substance, that while DIMARE is aware of the complexity of the corporate bond's tax free status, that the tax free corporate bond is not a tradeable security and the "uniqueness of its reporting" (the apparent reasons the tax free corporate bond clients did not have web access to monitor its status like other securities bought and sold through John Hancock), DIMARE wished to expedite web access for these particular investors because these investors would be traveling an extended period of time in the near future and would like to monitor remotely the tax free corporate bond's status.

20. On or about April 28, 2008, DIMARE forwarded another fabricated e-mail to this same investor, which was purportedly sent from "Jim Cowlishaw" (this time from a different e-mail address of jcowlishaw@bellsouth.net) to DIMARE at mdmfg@bellsouth.net, stating, in substance, the reasons for the delays in internet access for the tax free corporate bond clients, specifically that the delay resulted from other ongoing IT projects to service client access issues to the John Hancock website.

21. In the e-mail, "Jim Cowlishaw" provided his toll free office number and a cell phone number, both of which were fabricated. The toll free office number contained a voice mail greeting that DIMARE created.

7

22. There is no employee, representative or affiliated agency employee named "Jim Cowlishaw" in the John Hancock network.

23. In or about May 2008, DIMARE's affiliations with John Hancock and ING were terminated.

24. During DIMARE's execution of the scheme and artifice to defraud, DIMARE marketed and sold the fictitious "tax free corporate bond" to approximately twenty-two investors, who collectively sustained losses of approximately $1,977,168.20.

### E. **MAILINGS**

On or about the dates set forth below in Count One, at Ponte Vedra Beach, in the Middle District of Florida,

MICHAEL JOSEPH DIMARE

the defendant herein, for the purpose of executing the aforesaid scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly place and cause to be placed in a post office and authorized depository for mail matter, certain matter and things, as identified below, to be sent and delivered by the United States Postal Service and commercial interstate carriers to the addresses listed below, and took and received certain matter and things at the place they had been directed to be delivered by the United States Postal Service.

| COUNT | DATE | ITEM MAILED | MAILED FROM | MAILED TO | CARRIER |
|---|---|---|---|---|---|
| ONE | 4/15/08 | Consolidated Summary Statement dated 4/15/2008 to R.M. and S.M. | Michael DiMare - MDM Financial Group, 100 Executive Way Suite 204, Ponte Vedra Beach, FL 32082 | R.M. and S.M. | USPS |

In violation of Title 18, United States Code, Sections 1341.

## FORFEITURES

1.  The allegations contained in Count One of the Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.  From his engagement in the violations alleged in Count One of the Information, punishable by imprisonment for more than one year, the defendant

MICHAEL JOSEPH DIMARE

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all of his interest in any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violation, including but not limited to the following:

> A sum of money equal to $1,977,168.20 in United States currency, representing the amount of proceeds obtained as a result of the offense, 18 U.S.C. § 1341.

3.  If any of the property described in paragraph 2, as a result of any act or omission of the defendant:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third party;

  c. has been placed beyond the jurisdiction of the court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A. BRIAN ALBRITTON
United States Attorney

By: _____
A. TYSEN DUVA
Assistant United States Attorney

By: _____
MAC D. HEAVENER, III
Assistant United States Attorney
Deputy Chief, Jacksonville Division

10