UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

OPEN COURT
2-8-10
U. S. DISTRICT COURT
MIDDL DISTRICT OF FLOR.uA
JAC ONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.                                                  Case No.      3:10-cr- 33-J-32TEM

MICHAEL JOSEPH DIMARE

## PLEA AGREEMENT

### A.    **Particularized Terms**

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by A. Brian

Albritton, United States Attorney for the Middle District of Florida, and the defendant,

MICHAEL JOSEPH DIMARE ("Dimare"), and the attorney for the defendant, Tom Bell,

Esquire, mutually agree as follows:

    1.    Count(s) Pleading To

The defendant shall enter a plea of guilty to Count One of the Information.

Count One charges the defendant with mail fraud pursuant to 18 U.S.C. § 1341.

    2.    Maximum Penalties

Count One carries a maximum term of imprisonment of twenty (20) years, a fine

of $250,000.00, a term of supervised release of up to three (3) years, and a special

assessment of $100, said special assessment to be due on the date of sentencing. If

the defendant violates the terms and conditions of supervised release, the defendant

could be sentenced up to an additional two (2) years.  With respect to certain offenses,

the Court shall order the defendant to make restitution to any victim of the offense, and

Defendant's Initials _____                           AF Approval _____

with respect to other offenses, the Court may order the defendant to make restitution to

any victim of the offense, or to the community, as set forth below.

3.    Elements of the Offense

The defendant acknowledges understanding the nature and elements of the

offense with which defendant has been charged and to which defendant is pleading

guilty.  The elements of Count One of the Information, mail fraud, are:

| First: | That the Defendant knowingly devised or participated in a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises; |
|---|---|
| Second: | That the false of fraudulent pretenses, representations or promises related to a material fact; |
| Third: | That the Defendant did so willfully and with intent to defraud; and |
| Fourth: | That the Defendant used the United States Postal Service by mailing or by causing to be mailed some matter of thing for the purpose of executing the scheme to defraud. |

4.    Base and Adjusted Offense Level

Pursuant to Fed. R. Crim. P. 11, the United States and the defendant stipulate

and agree that the defendant's adjusted offense level is, as determined below:

| Guideline | Description | Levels |
|---|---|---|
| § 2B1.1(a)(1) | Base Offense | 7 |
| § 2B1.1(b)(1)(l) | Specific Offense Characteristic (Loss - more than $1,000,000.00 but less than $2,500,000.00) | 16 |
| § 2B1.1(b)(2)(A) | Involved 10 or More Victims | 2 |

Defendant's Initials  _MDM_                    2

| § 2B1.1(b)(17) | Violation of Securities Law and Defendant was a Registered Broker or Investment Adviser | 4 |
| ~~§ 3A1.1(b)~~ | ~~Vulnerable Victim~~ (ATD) (MDW) | ~~2~~ |
| § 3E1.1 | Acceptance of Responsibility | -3 |

Total Adjusted Offense Level                    ~~28~~ 26 *(handwritten: ATD, MDW)*

The defendant understands that this stipulation and agreement is not binding on the

Court, and if not accepted by the Court, the defendant will not be allowed to withdraw

from the plea. *[handwritten: The government likewise intends to present evidence at sentencing to support an additional 2 level enhancement under §3A1.1(b) - the Vulnerable Victim Enhancement.]*

5.   Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is

received suggesting such a recommendation to be unwarranted, the United States will

recommend to the Court that the defendant receive a two-level downward adjustment

for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant

understands that this recommendation or request is not binding on the Court, and if not

accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant complies with the provisions

of USSG §3E1.1(b), the United States agrees to file a motion pursuant to USSG

§3E1.1(b) for a downward adjustment of one additional level. The defendant

understands that the determination as to whether the defendant has qualified for a

downward adjustment of a third level for acceptance of responsibility rests solely with

the United States Attorney for the Middle District of Florida, and the defendant agrees

Defendant's Initials *[handwritten]*                    3

that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

### 6. Relevant Conduct as to Applicable "Loss" - Section 1B1.3

Pursuant to USSG §1B1.3, the United States and defendant agree that together with defendant's plea to Count One of the Information (mail fraud pertaining to the mailing of a Consolidated Summary Statement), defendant's relevant conduct establishes that the applicable loss under USSG § 2B1.1(b)(1) is appropriately calculated as more than $1,000,000.00, but less than $2,500,000.00.

### 7. Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees. The assets to be forfeited specifically include a money judgment in the amount of $1,977,168.20, representing the amount of proceeds obtained as a result of Count One of the Information. The defendant also hereby agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have that the forfeiture constitutes an excessive fine.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea

Defendant's Initials _____  4

agreement, the court make a determination that the government has established the amount of the proceeds is $1,977,168.20 and enter an order of forfeiture. Pursuant to Rule 32.2(b)(4), the defendant agrees that the order of forfeiture shall be final as to the defendant at the time it is entered, notwithstanding the requirement that it be made a part of the sentence and be included in the judgment.

The defendant agrees that the United States shall, at its option, be entitled to forfeiture of any property (substitute assets) of the defendant up to the value of $1,977,168.20 in order to satisfy the money judgment. This Court shall retain jurisdiction to settle any disputes arising from application of this clause. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant agrees to take whatever steps are necessary to pass clear title to the United States of any assets sought to satisfy the money judgment. These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Defendant further agrees to take all steps necessary to locate property which could be used to satisfy the money judgment and to pass title to the United States before the defendant's sentencing. To that end, defendant agrees to fully assist the government in the recovery and return to the United States of any assets, or portions thereof, as described above wherever located. The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.

Defendant's Initials _____        5

### 3.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit, upon execution of this plea agreement, an affidavit reflecting the defendant's financial condition. The defendant further agrees, and by the execution of this plea agreement, authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office or any victim named in an order of restitution, or any other source, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.

### 4.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United

Defendant's Initials _MMM_                7

States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

5.     Appeal of Sentence Directly or Collaterally - Waiver

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence directly or to challenge it collaterally (such as through a motion pursuant to 28 U.S.C. § 2255) on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by Title 18, United States Code,

Defendant's Initials  _____                    8

Section 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by Title 18, United States Code, Section 3742(a).

6.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

7.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

8.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the

Defendant's Initials _____        9

assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

9.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials *MMM*                     10

10.    Entire Agreement

This plea agreement constitutes the entire agreement between the government

and the defendant with respect to the aforementioned guilty plea and no other

promises, agreements, or representations exist or have been made to the defendant or

defendant's attorney with regard to such guilty plea.

11.    Certification

The defendant and defendant's counsel certify that this plea agreement has

been read in its entirety by (or has been read to) the defendant and that defendant fully

understands its terms.

DATED this ___/___ day of January, 2010.

A. BRIAN ALBRITTON
United States Attorney

By:

MICHAEL JOSEPH DIMARE
Defendant

A. TYSEN DUVA
Assistant United States Attorney

TOM BELL, ESQUIRE
Attorney for Defendant

MAC D. HEAVENER, III
Assistant United States Attorney
Deputy Chief, Jacksonville Division

Defendant's Initials _____                          11

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 3:10-cr-

**JOSEPH**
MICHAEL JOSPEH DIMARE
_____

## PERSONALIZATION OF ELEMENTS

1.      Do you admit that from between in or about at least 2001 through in or about May 2008, in Ponte Vedra Beach, in the Middle District of Florida, Boston Massachusetts, and elsewhere, that you knowingly devised a scheme to defraud to obtain money or property by means of false pretenses, representations or promises?

2.      Do you admit that the false pretenses, representations or promises related to a material fact, such material fact(s), including, but not limited to, that the "tax free corporate bond" offered via John Hancock, the Della Porta Agency and ING Financial Services, Inc. was indeed a legitimate investment, when, in fact, it was not?

3.      Did you do so willfully and with the intent to defraud?

4.      Did you cause to be transmitted by the United States Mail a communication, that is a "Consolidated Summary Statement" sent to victims R.M. and S.M. on or about April 15, 2008 from MDM Financial Group, 100 Executive Way, Suite 204, Ponte Vedra Beach, Florida 32082, for the purpose of executing the scheme to defraud?

Defendant's Initials _____        12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 3:10-cr-

MICHAEL JOSEPH DIMARE

## FACTUAL BASIS[1]

MICHAEL JOSEPH DIMARE ("DIMARE") was employed by John Hancock

Financial Services and later the Della Porta Agency ("Della Porta") from 1990 to June

2006.  Della Porta was part of the John Hancock Financial Network, which provided

investment and life insurance products under the affiliate Signator Investors, Inc.  After

DIMARE left Della Porta in June 2006, DIMARE remained affiliated with John Hancock

inasmuch as DIMARE continued to operate within the John Hancock network as a

licensed representative.  This allowed DIMARE to continue to offer and sell investment

and life insurance products to approximately three hundred and fifty known John

Hancock clients until DIMARE was terminated by John Hancock in May 2008.

In or about October 2006, DIMARE also became a licensed representative of

ING Financial Services, Inc. ("ING"), which entitled DIMARE to sell ING investment and

insurance products.  DIMARE remained a licensed representative of ING until ING

terminated DIMARE in May 2008.

---

[1]The factual basis is prepared by the United States and does not include all of
the facts relevant to the defendant's involvement in the crime to which he is pleading
guilty and other illegal activities in which he may have been involved.

Defendant's Initials _____

DIMARE held a State of Florida license number as a financial broker and registered representative. In 1993, DIMARE passed the Financial Industry Regulatory Authority ("FINRA") exam, Series 6, which allowed DIMARE to sell mutual funds, variable and fixed annuity products and whole life insurance products. DIMARE never passed the FINRA, Series 7, which would have allowed DIMARE to legally sell individual stocks and bonds. FINRA is a non-governmental regulatory agency that oversees the financial industry.

Between in or about at least 2001 and in or about May 2008, at Ponte Vedra Beach, Jacksonville Beach, in the Middle District of Florida, Boston, Massachusetts and elsewhere, DIMARE devised a scheme to defraud, specifically offering known John Hancock and ING investors a fraudulent investment opportunity that DIMARE marketed as a "tax free corporate bond," as well as other permutations of that same "investment."

DIMARE, using his employment with John Hancock, the Della Porta Agency and ING, contacted investors, whom DIMARE had previous and ongoing legitimate investment relationships with via his John Hancock and ING network affiliations, and fraudulently marketed an investment opportunity of a "tax free corporate bond." There is no legitimate investment security known as a "tax free corporate bond."

DIMARE told most of the investors, many of whom are elderly, that: (1) this particular investment, the "tax free corporate bond," would render a quarterly return on investment of approximately eight percent; (2) the "tax free corporate bond" was offered for a limited time to Florida residents because of the hurricanes that hit the state of Florida in 2004; (3) the program would take effect in January 2005 and would initially last only three months; and (4) any money invested in this "tax free corporate bond"

Defendant's Initials _MDM_                2

would have to be "new money," not funds transferred from an existing John Hancock or ING investment. Since at least 2001, DIMARE also offered similar other types of fraudulent investments to existing John Hancock and Della Porta clients, which, in many instances, mirrored the "tax free corporate bond" opportunity.

After the initial three month period of the "tax free corporate bond" (which purportedly began in 2004), DIMARE, about every six months, told investors that the bond program would continue for periods of six additional months. Further, DIMARE told investors in late 2007 that the bond program would likely extend through calendar year 2008.

On or about December 17, 2007, DIMARE drafted a letter on John Hancock letterhead (bearing the insignia and trademark of John Hancock) purportedly from "Donna Dow - Client Relationship Manager" to "Michael J. DiMare" advising, in substance, that the Corporate Bond series would extend through calendar year 2008, but no longer, based on the anticipation that the sustained high yield growth would not last beyond 2008. At the time the letter was issued, an individual named "Donna Dow" served as the John Hancock Manager of the Long Term Care New Business unit in Boston, Massachusetts, not as a "Client Relationship Manager" having any involvement with the purported "tax free corporate bond" investment. The December 17, 2007 letter was not authored or sent by Dow, but instead was created by DIMARE, who fraudulently attached Dow's name to the letter. There was no signature from "Donna Dow" on the letter.

DIMARE then forwarded a copy of that letter to at least two investors, R.M. and S.M. (a married couple), sixty-seven and sixty eight years old respectively, and wrote a

Defendant's Initials _MDM_                    3

handwritten note on the face of letter stating, "[R and S] - Hopefully this fits into your plans and is a nice xmas present. Talk to you soon...Happy New Year! Michael." On or about January 7, 2008, after receiving this fraudulent letter with DIMARE's handwritten note on the face of the letter, R.M. and S.M. provided DIMARE an additional amount of $150,000 via check for DIMARE to invest in the "tax free corporate bond."

Throughout the scheme, DIMARE obtained funds from the investors via personal meetings and took the monies received and deposited them into a bank account that DIMARE had opened in 2001 with First Union Bank (which later became Wachovia Bank) under the name "Michael J. Dimare dba John Hancock Financial Services." DIMARE did not have authorization from John Hancock to open this account. At no time was this account an authorized John Hancock account for receipt of John Hancock investor funds. Once DIMARE deposited these funds into the First Union/Wachovia Bank account, DIMARE utilized them for living expenses, car payments, rent payments for his apartment and office spaces, credit card payments, to pay certain customers their "interest earned" on the "tax free corporate bond" investment or to provide a few customer requested withdrawals.

DIMARE also prepared "Consolidated Summary Statements" concerning the purported success of the fraudulent "tax free corporate bond" investment and mailed via the United States Mail and hand delivered those statements to the various investors setting forth the "accrued interest" on the "tax free corporate bond." These "Consolidated Summary Statements" were sent to the investors separate from the investors' statements concerning the legitimate investments they held with John

Defendant's Initials _*///)u/*_          4

Hancock. The "Consolidated Summary Statements" hand delivered and mailed to investors bore the insignia and trademark of John Hancock, listed the product as "corporate bond" and itemized dates and amounts of each deposit, which, for some investors, was as much as of $100,000 or $150,000 per deposit. In fact, on or about April 15, 2008, DIMARE sent a "Consolidated Summary Statement" to R.M. and S.M. via the United State Mail.

In or about April 2008, when R.M. and S.M. asked DIMARE about obtaining internet access to their John Hancock account, DIMARE created a series of e-mail accounts and forwarded fabricated e-mails to R.M. and S.M. purportedly between DIMARE and a "Jim Cowlishaw," who DIMARE represented as the "Vice President for Corporate Information Technology Support" for John Hancock, concerning whether the "tax free corporate bond" clients would be afforded internet access to view the progress of their account. "Jim Cowlishaw" was purportedly working on internet access capability for the tax free corporate bond clients. The fabricated e-mail address that DIMARE created was jcowlishaw@jhnetwork.com.

On or about April 23 and 24, 2008, DIMARE forwarded a series of e-mails to R.M. and S.M. that DIMARE had purportedly sent to "Jim Cowlishaw" concerning DIMARE's request to expedite web access for these particular tax free corporate bond clients. In the e-mail from DIMARE to "Jim Cowlishaw," DIMARE states, in substance, that while DIMARE is aware of the complexity of the corporate bond's tax free status, that the tax free corporate bond is not a tradeable security and the "uniqueness of its reporting" (the apparent reasons the tax free corporate bond clients did not have web access to monitor its status like other securities bought and sold through John

Defendant's Initials _MD14_                5

Hancock), DIMARE wished to expedite web access for these particular investors because these investors would be traveling an extended period of time in the near future and would like to monitor remotely the tax free corporate bond's status.

On or about April 28, 2008, DIMARE forwarded another fabricated e-mail to this same investor, which was purportedly sent from "Jim Cowlishaw" (this time from a different e-mail address of jcowlishaw@bellsouth.net) to DIMARE at mdmfg@bellsouth.net, stating, in substance, the reasons for the delays in internet access for the tax free corporate bond clients, specifically that the delay resulted from other ongoing IT projects to service client access issues to the John Hancock website. In the e-mail, "Jim Cowlishaw" provided his toll free office number and a cell phone number, both of which were fabricated. The toll free office number contained a voice mail greeting that DIMARE created. There is no employee, representative or affiliated agency employee named "Jim Cowlishaw" in the John Hancock network.

In May 2008, DIMARE's affiliations with John Hancock and ING were terminated. During DIMARE's execution of the scheme and artifice to defraud, DIMARE marketed and sold the fictitious "tax free corporate bond" to approximately twenty-two investors, who collectively sustained losses of approximately $1,977,168.20. Some of the victims are elderly. One particular investor, V.K.N., was in her mid eighties during the time she "invested" in DiMare's "corporate bond" scheme. V.K.N. began investing in mid 2002 and continued through December 2007. During the scheme, V.K.N. provided DiMare with approximately $1,433,334.00. DiMare regularly refunded principal and "interest" to V.K.N. during the course of the scheme. However, V.K.N. did not receive

Defendant's Initials _____      6

approximately $72,000.00 from V.K.N.'s last two "investment" payments to DiMare.

V.K.N. was eighty-seven (87) years of age when she last invested.

During the execution of this scheme, DIMARE, while operating as a Della Porta,

John Hancock and ING investment adviser, violated numerous securities laws,

including, but not limited to, Title 18, United States Code, Section 1348 (Securities

Fraud) and Title 15, United States Code, section 78j(b) (Manipulative and Deceptive

Practices - Use of the Mail or any Instrumentality of Commerce Concerning the Sale of

a Security not Registered on a National Securities Exchange).

Defendant's Initials _____         7